**UNITED STATES DISTRIC"T COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CARLA ROSARIO, individually and on behalf of other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>COMPASS GROUP, USA, INC.,<br><br>Defendant. | No. 3:15-cv-00241 (MPS) |

**RULING ON MOTION FOR CONDITIONAL CERTIFICATION**

Plaintiff claims that her former employer, the Eurest Dining Services Division of Defendant Compass Group, USA, Inc., failed to pay her time-and-a-half for overtime hours worked in excess of 40 hours per week in violation of federal law. Plaintiff seeks to proceed as a "collective" on behalf of a nationwide group of allegedly "similarly situated" assistant manager ("AM") employees described in her second amended complaint. ("SAC," ECF No. 39.) Because Plaintiff has failed to make even a modest factual showing that the AMs are "similarly situated," Plaintiff's motion for conditional certification (ECF No. 41) is DENIED without prejudice.

**I.     BACKGROUND**

Carla Rosario (the "Plaintiff") brings this action against the Eurest Dining Services Division ("Eurest") of Defendant Compass Group, USA, Inc. ("Compass"), a national food service company headquartered in Charlotte, North Carolina. (SAC ¶ 6.) According to Compass, Eurest "provides foodservice management and support services to clients in a variety of settings, including cafeterias, food courts, and other foodservice operations at corporate offices, corporate campuses, manufacturing plants, casinos, and other facilities." (Declaration of Marcel White ("White Decl."), ECF No. 43-10 ¶ 5.) "Over 200 individuals have worked as AMs in the Eurest

1

Dining Services division since August 2012," and they "perform a wide variety of functions at approximately 227 of the 1,900 Eurest Dining Services division locations." (ECF No. 43 at 7 (*citing* White Decl., ECF No. 34-10).)

Rosario brings this action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), to recover unpaid overtime pay allegedly owed to her and other similarly situated AMs who, she alleges, were misclassified as "exempt" from overtime requirements. (SAC ¶ 1.) Rosario worked as an AM for a café at the Mohegan Sun Casino in Montville, Connecticut (SAC ¶ 3), from January 2014 through August 2014.[1] (*Id*. ¶ 11.) Like all AMs, Rosario was classified as exempt from overtime laws and paid on a salary basis. (*Id*. ¶ 14.) Rosario was scheduled to work from 11 p.m. until 9 a.m. five days per week, or approximately 50 hours per week. (*Id*. ¶¶ 12-13.) Rosario alleges that she and all other AMs "spend well over 50% of their time performing non-exempt manual labor, including: counting stock, cashiering, producing food, cooking on the line, stocking, baking, replenishing the salad and soup bar and washing dishes" (*id*. ¶ 15; Declaration of Carla Rosario ("Rosario Decl.") ¶ 8), and that such "manual labor is the primary duty of [AMs]." (SAC ¶ 16.) Rosario also alleges that all AMs "share a common job description" (*id*. ¶ 17), and "are subject to common corporate policies and procedures." (*Id*. ¶ 18.) She submitted the following documents purporting to show that Eurest "is centrally controlled and uniformly operated": the "About Us" page of the Compass website (Exhibit A), the Compass Salaried Associate Handbook (Exhibit D), the Compass Persons with Disabilities Policy (Exhibit E), the Compass Family and Medical Leave Policy (Exhibit F), the Compass "Speak Up" Policy (Exhibit G), Rosario's Acknowledgement of Receipt of Compass's Zero

---

[1] Rosario took a leave of absence in April 2014, and her employment ended in August 2014 when she did not return to work. (Carla Rosario Deposition ("Rosario Tr.") at 117, 119.)

Tolerance Discrimination and Harassment Policy & 2013 Employment Policies (Exhibit H), and the Compass Memorandum on Open Communication Process (Exhibit I). (Plaintiff's Memorandum ("Pl. Br."), ECF No. 41 at 3.) Rosario alleges that AMs do not "exercise discretion or independent judgment on matters of significance" (SAC ¶ 19), and "do not have the authority to hire or fire other employees" without the approval of Compass's Human Resources Department. (*Id.* ¶ 20.)

Kathleen Rigert opted-in to the proposed collective action on April 17, 2015 (ECF No. 15) and Jennifer Horne opted-in on April 22, 2015. (ECF No. 20.) According to their sworn declarations, Rigert has worked as an AM at the Credit Suisse Bank Café in Morrisville, North Carolina, since January 2014. (Declaration of Kathleen Rigert ("Rigert Decl."), ECF No. 41-11 ¶ 3.) She works from 6 am until 8 or 9 pm five days per week, is paid a salary, and is classified as exempt. (Rigert Decl., ECF No. 41-11 ¶¶ 4, 6.) Horne worked as an AM at the American Express Service Center in Plantation, Florida, from November 2008 until January 2013. (Declaration of Jennifer Horne ("Horne Decl."), ECF No. 41-12 ¶ 3.) She worked about ten hours a day, five days per week, or approximately 50 hours per week (*id.* ¶ 4); was paid a salary; and was classified as exempt. (*Id.* ¶ 5.) Rigert alleges that she "spend[s] well over 50% of [her] time performing non-exempt manual labor, including: counting stock, cashiering, serving food on the line, stocking, replenishing the salad and soup bar, sweeping, and wiping counters." (Rigert Decl., ECF No. 41-11¶ 9.) Horne claims that she spent at least 70% of her time performing much of the same non-exempt manual labor, as well as "producing food, cooking on the line, . . . baking, . . . and washing dishes." (Horne Decl., ECF No. 41-12 ¶ 6.) Although Rigert and Horne admit that they performed some management duties, they claim that such tasks were low-level, such as minor discipline, generally directing employees, "and being a source of low level

training and information" for subordinates. (Horne Decl., ECF No. 41-12 ¶ 8; Rigert Decl., ECF No. 41-11 ¶ 13.) The opt-ins further allege that they did not perform management and non-management tasks simultaneously. (Horne Decl., ECF No. 41-12 ¶ 7; Rigert Decl., ECF No. 41-11 ¶ 12.)

Rosario submitted a detailed job description for her position as the AM/Manager on Duty ("MOD") at Mohegan Sun Casino. (Pl.'s Ex. J.) In their declarations, Rosario and both opt-ins claim that the MOD job description "accurately describes the majority of [their] duties" as AMs. (Rosario Decl., ECF No. 41-2 ¶ 16; Horne Decl., ECF No. 41-12 ¶ 12; Rigert Decl., ECF No. 41-11 ¶ 18.) All three allege that they performed the following non-management tasks: participating in food preparation, preservation, service safety, sanitation, and portion control; "[k]eep[ing] display equipment clean and free of debris during meal service"; "[c]leaning equipment"; "[c]lean[ing] workstation thoroughly before leaving the area for other assignments"; "[s]erv[ing] customers quickly"; and "[c]lean[ing] up spills . . . immediately." (Rosario Decl., ECF No. 41-2 ¶ 17, Horne Decl., ECF No. 41-12 ¶ 13; Rigert Decl., ECF No. 41-11 ¶19.) Finally, both opt-ins and Rosario allege that their "non-management tasks are the most important tasks" they perform as AMs. (Rosario Decl., ECF No. 41-2 ¶ 18; Horne Decl., ECF No. 41-12 ¶ 14; Rigert Decl., ECF No. 41-11 ¶ 20.)

The deposition testimony of Rosario, Horne, and Rigert, however, provided greater detail about their duties, and painted a much more nuanced overall picture than their declarations. For example, Horne testified that AM duties varied "based on the staffing at a particular location" and "based on who the manager was for that location." (Horne Tr. at 245.) Horne's position involved tasks—such as analyzing financial statements, paying invoices, processing payroll, marketing, scheduling, and clerical work—that other AMs, like Rosario, did not do. (Horne Tr.

at 115-25; Rosario Tr. at 125 ("I had nothing to do with payroll.").) In fact, Horne's manager asked her to create a job description for her position "because . . . there was technically no job description." (Horne Tr. at 60; Def.'s Opp. Br. Ex. 13.) Rigert testified that she has never seen a document detailing the duties of her position, and that to learn what duties she actually performed, one would have to ask her. (Rigert Tr. at 116-17.) Rosario testified that Bethany McMahon, one of the AMs at Mohegan Sun, "did payroll and some administrative tasks. I'm not sure all what they were," while Rosario did not do payroll. (Rosario Tr. at 237-38.) McMahon had her own office, and spent most of her time there. (*Id*.)

Rosario filed her original Collective Action Complaint on February 19, 2015 (ECF No. 1), her first amended complaint on June 15, 2015 (ECF No. 31), and the SAC on June 29, 2015. (ECF No. 39.) Rosario filed a motion to conditionally certify a collective action on June 30, 2015, seeking to certify a collective action on behalf of all AMs who worked at Eurest within the last three years. (ECF No. 41.) Compass filed its opposition brief on August 10, 2015. (ECF No. 43.) Rosario filed a reply brief on August 24, 2015 (ECF No. 45), and Compass filed a sur-reply on September 2, 2015 (ECF No. 49), with the Court's permission. (*See* ECF No. 44.)

## II. <u>STANDARD</u>

The FLSA prohibits employers from employing an employee "for a workweek longer than forty hours unless such employee receives compensation for his employment" in excess of forty hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Several categories of employees are exempt from this requirement, however, including "any employee employed in a bona fide executive, administrative, or professional capacity." *Id*. § 213(a)(1). "Executive" and "administrative" employees are "[c]ompensated on a salary basis at a rate of not less than $455 per week." 29

5

C.F.R. §§ 541.100(a)(1), 541.200(a)(1). An "executive" employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." *Id*. § 541.100 (a)(2). An "executive" "customarily and regularly directs the work of two or more other employees" and either "has the authority to hire or fire other employees" or her "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." *Id*. § 541.100 (a)(3)-(4). An "administrative" employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and her role "includes the exercise of discretion and independent judgment with respect to matters of significance." *Id*. § 541.200 (a)(2)-(3).

A plaintiff may bring an action to recover for violations of the FLSA on behalf of herself and "other employees similarly situated." 29 U.S.C. § 216(b). "[S]uch a joint, or collective, action requires potential plaintiffs to opt in to the suit in order to benefit from any judgment." *Neary v. Metro. Prop. & Cas. Ins. Co.,* 517 F. Supp. 2d 606, 618 (D. Conn. 2007) (quotation marks omitted) (citing 29 U.S.C § 216(b)). "[D]istrict courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (quoting *Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 169 (1989)). The Second Circuit has cited with approval the two-step method that district courts in this Circuit use to determine whether to exercise such discretion. *Myers,* 624 F.3d at 554-55.

> The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be "similarly situated" to the named plaintiffs with respect to whether a FLSA violation has occurred. The court may send this notice after plaintiffs make a "modest factual showing" that they and potential

>opt-in plaintiffs "together were victims of a common policy or plan that violated the law." In a FLSA exemption case, plaintiffs accomplish this by making some showing that "there are other employees . . . who are similarly situated with respect to their job requirements and with regard to their pay provisions," on which the criteria for many FLSA exemptions are based, who are classified as exempt pursuant to a common policy or scheme. The "modest factual showing" cannot be satisfied simply by "unsupported assertions," but it should remain a low standard of proof because the purpose of this first stage is merely to determine *whether* "similarly situated" plaintiffs do in fact exist. At the second stage, the district court will, on a fuller record, determine whether a so-called "collective action" may go forward by determining if the plaintiffs who have opted in are in fact "similarly situated" to the named plaintiffs. The action may be "de-certified" if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice.

*Id.* at 555 (internal citations omitted). *See also Glatt v. Fox Searchlight Pictures, Inc.*, No. 13-4478-CV, 2016 WL 284811, at *9 (2d Cir. Jan. 25, 2016).

Here, the parties have engaged in some discovery prior to completing briefing on the motion. Specifically, as noted, Rosario and the two opt-in plaintiffs have been deposed, giving testimony that has provided much more detail than (and, in places, contradicted) their declarations, and Rosario has taken a Rule 30(b)(6) deposition of a Compass Human Resources employee. (Plaintiff's Reply Brief, ECF No. 45 at 6.) Some courts have found that in a case such as this, when some discovery has placed a significant volume of evidence before the court, the court should require more than just a "modest factual showing," albeit less than the showing required at the second step (following full discovery). *See, e.g., Bunyan v. Spectrum Brands, Inc.*, No. 07-CV-0089-MJR, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008). I have adopted such an "intermediate" approach in another case. *See Alicea et al v. Walsh Construction Company*, 3:13-cv-00102-MPS (ECF No. 105). Here, however, I need not do so because Rosario cannot, on the existing record, make even a "modest factual showing" that she and potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law.".

### III.  DISCUSSION

Rosario moves to certify a nationwide collective consisting of all AMs who have worked in the Eurest division during the last three years. (ECF No. 41 at 2.) Compass argues that this Court should deny the motion because Rosario fails to make the "modest factual showing" that she and potential opt-in plaintiffs were victims of a common and unlawful policy or plan. The Court agrees.

First, contrary to Rosario's argument (ECF No. 41 at 13), the uniform classification of AMs as exempt is insufficient, on its own, for the Court to grant conditional certification. *Vasquez v. Vitamin Shoppe Indus. Inc.*, No. 10 CIV. 8820 LTS THK, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011) ("the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes."); *see also, Glatt*, 2016 WL 284811, at *10 (vacating district court's order certifying proposed class despite the fact that plaintiffs were uniformly classified as unpaid interns). The cases that Rosario cites in support of its argument are distinguishable. For example, in *Lassen v. Hoyt Livery Inc.*, the court found that it was "undisputed that all full-time limousine drivers at Hoyt Livery had the same job duties and were subject to the same allegedly unlawful compensation policies." No. 3:13-CV-01529 JAM, 2014 WL 4638860, at *7 (D. Conn. Sept. 17, 2014). In *Damassia v. Duane Reade, Inc.*, a Rule 23 case, "a store manager, who ha[d] worked in five different stores . . . state[d] that "[t]here was no significant variation in the job duties of assistant managers in any of the five stores [she] worked in." 250 F.R.D. 152, 159 (S.D.N.Y. 2008). In addition, Duane Reade "admit[ed] that it does not consider any factors other than job title in deciding to categorize an assistant manager as exempt." *Id.* Rosario cites the testimony of Sheryl Solomon, Compass's Director of

Compensation, in support of its allegation that Compass made a blanket, company-wide decision to classify AMs as exempt, without conducting individual analyses of their job duties. (Plaintiff's Reply Brief, ECF No. 45 at 6.) Solomon testified that it was not Compass's practice to "do exemption decisions on a person by person basis as they were hired." (Solomon Tr. at 47). As Compass points out, however, Solomon also testified that, at each location, Compass employees monitor the job duties performed by exempt AMs to determine whether their positions should remain exempt. (Defendant's Sur-reply, ECF No. 49 at 2-3; Solomon Tr. at 67 ("The expectation is that HR reps are kind of our eyes and ears in the field . . . . [T]hey would be expected to bring that to someone's attention if they suspected that that person was really not performing in an exempt capacity.").)

      Second, the Compass documents that Rosario submitted do not show that Eurest "is centrally controlled and uniformly operated," let alone that its assistant managers are "similarly situated." (Defendant's Opposition Brief ("Def.'s Opp. Br."), ECF No. 43 at 32.) The "About Us" page of the Compass website states that every individual at Compass "has a responsibility to uphold the standards set out in the Code of Business Conduct . . . ." (Pl.'s Br. Ex. A., ECF No. 41-1.) It is not clear what the Code of Business Conduct requires, but nothing on the page suggests, as Rosario alleges, that Compass "maintains tight top-down control over Eurest's cafeteria operations from its corporate headquarters in Charlotte, North Carolina." (Pl.'s Br., ECF No. 41 at 4.) Moreover, the corporate policies that Rosario alleges "govern employee conduct, and the manner in which [employees] carry out their jobs" (*id*.)—the Salaried Associate Handbook, the Persons with Disabilities Policy, the Family and Medical Leave Policy, the "Speak Up" Policy, Rosario's Acknowledgement of Receipt of Compass's Zero Tolerance Discrimination and Harassment Policy & 2013 Employment Policies, and the Memorandum on

Open Communication Process—do not show that Compass tightly controlled AMs' duties. Finally, "even if the Defendants did centrally and tightly control the job duties of its employees . . . this fact alone would not satisfy the named plaintiff's modest burden to show that he or she and the potential opt-in plaintiffs together were victims of a common policy or plan that *violated the law.*" *See Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343, 352 (E.D.N.Y. 2015) (internal quotation marks omitted).

Third, Rosario fails to make even a "modest showing" that the duties of AMs were similar. The corporate policies—on their faces—do not contain any specific information about the duties of AMs on a daily basis. And as Compass points out, the opt-ins admitted this during their depositions. (ECF No. 43-3, Rigert Tr. at 122-30; ECF No. 43-4, Horne Tr. at 238-242.) In support of her argument that AMs are "subject to the same job description" and "spend the majority of their time performing non-management duties" (Pl.'s Br., ECF No. 41 at 5), Rosario also submitted job postings for Eurest AMs in Foxborough, Massachusetts; Charlotte, North Carolina; Madison, Wisconsin; and Bentonville, Arkansas. (Pl.'s Br. Ex. P, ECF No. 41-16.) These job postings show that, in four different geographic locations, Eurest uses similar advertisements for AM positions. In addition to listing qualifications for the AM position, the advertisements list the general responsibilities of AMs, including: "assisting the site manager with running the day to day operations of the account"; "manag[ing] and lead[ing] a team of associates and oversee[ing] quality controls for the account"; "[t]rain[ing], manag[ing], and develop[ing] hourly associates"; "[a]ssist[ing] with catering events"; and "[r]oll[ing] out new culinary programs . . . ." (Pl.'s Br. Ex. P, ECF No. 41-16.) Like the corporate policies, these job postings also do not describe the specific duties of AMs on a daily basis, and they do not support Rosario's conclusory statement that AMs "spend the majority of their time performing non-

10

management duties." (Pl.'s Br., ECF No. 41 at 5.) Moreover, Horne testified that she did not know if these job postings accurately described an AM's duties in any particular unit because AM duties varied "based on the staffing at a particular location" and "based on who was the manager for that location." (Horne Tr. at 245.) Horne's manager asked her to create her own job description for her AM position "because . . . there was technically no job description." (Horne Tr. at 60; Def.'s Opp. Br. Ex. 13.) Horne's position involved analyzing financial statements, paying invoices, processing payroll, marketing, scheduling, and clerical work—which was different from both the work done by the other managerial employee at her location and from the manual labor that Rosario described as the focus of her position. (Horne Tr. at 60, 115-25.) Rosario also testified that she did not know if other AMs perform their jobs consistent with the general AM job postings. (Rosario Tr. at 272.) Rigert testified that she has never seen a document describing the duties of her position. (Rigert Tr. at 116.) Rosario testified that, unlike her, Bethany McMahon, one of the assistant managers at Mohegan Sun, "did payroll and . . . some administrative tasks. I'm not sure all what they were." (Rosario Tr. at 237.)[2] Rosario also submitted a detailed job description for her position as AM/Manager on Duty ("MOD") at the Mohegan Sun Casino. (Pl.'s Br. Ex. J, ECF No. 41-10.) Rosario and the opt-ins, however, admitted that they did not perform all of the duties listed on the job description, and that they did not know whether the job description described the duties of other AMs. (Rosario Decl., ECF

---

[2] Because the Court does not make credibility determinations at this stage, it does not consider the fact that Rosario, Horne, and Rigert each testified, inconsistent with their sworn declarations, that these general AM job postings did not accurately describe their own duties as AMs. (Rosario Tr. at 271-72 ("Q. Was it describing the job in a way that's consistent with the job you performed as an assistant manager? A. No."); Horne Tr. at 245 ("Q. Do you believe this is an accurate description of the assistant manager job that you performed? . . . A. No."); Rigert Tr. 120-21 ("Q. Would you agree that this document does not describe your job duties in your assistant manager position? . . . A. I don't believe it describes it, no.").)

No. 41-2 ¶ 16; Rigert Decl., ECF No. 41-11 ¶ 18; Horne Decl., ECF No. 41-12 ¶¶ 12-13; Rosario Tr. 228-37, 268-69, Horne Tr. at 249-50; Rigert Tr. at 130-33.) In fact, Rosario testified that she had no personal knowledge even of how the other AMs at the Mohegan Sun Casino—Bethany McMahon, Heather Brown, and Joseph Darigan—spent their time outside of the approximately one hour that her shift overlapped with theirs. (Rosario Tr. at 134, 397-98.) Horne and Rigert likewise testified that they did not know what other AMs did and that the only way to determine the job duties of other AMs would be to ask each AM individually. [3] (Horne Tr. at 233-34; Rigert Tr. at 131-133.)

The existing record does not set forth even a "modest factual showing" that Rosario is similarly situated to all Eurest AMs.[4] *See, e.g., Nabi v. Hudson Grp. (HG) Retail, LLC*, 310 F.R.D. 119, 123 (S.D.N.Y. 2015) (evidence of uniform job description, performance of non-managerial tasks while covering for sick employees, similar job functions of AMs across nation, exempt classification, common employment policies, shared employment handbook, and same wage statements were insufficient for conditional certification). "[T]he plaintiff must provide 'actual evidence of a factual nexus between his situation and [the persons] he claims are

---

[3] Nothing in their declarations contradicts the deposition testimony of Rosario and the two opt-ins showing that they lack personal knowledge of the duties of other AMs and that their job duties differed substantially. Rosario's declaration states that her shifts would overlap with the another manager "by about an hour" and that during this time, she "was able to personally observe that the other Assistant Manager was also spending most of his or her time performing manual labor rather than managing." (Rosario Decl. ¶ 9.) Rosario lacks knowledge, however, of whether the other AMs' duties were *primarily* exempt or non-exempt, when taking into account all of their work hours in a given week.

[4] In opposing Rosario's motion, Compass submitted five sworn declarations from other AMs refuting Rosario's allegations. (ECF Nos. 43-5, 43-6, 43-7, 43-8, 43-9.) The Court has not considered these declarations at this stage because none of those witnesses has been deposed. *See Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150, 159 (N.D.N.Y. 2008) ("At this initial stage where all that is being determined is whether potential opt-in plaintiffs may be similarly situated, the court does not weigh the ultimate merits of the claims, resolve factual disputes, make credibility determinations, nor decide substantive issues.").

similarly situated.'" *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 801 (S.D.N.Y. 2012) (quoting *Prizmic v. Armour, Inc.*, No. 05-CV-2503 (DLI) (MDG), 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006)). "[Plaintiff] must show that he is similarly situated to the proposed plaintiffs with respect to [her] allegation that [s]he spent most of [her] time performing non-managerial tasks." *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 476-77 (S.D.N.Y. 2010). While the conclusory declarations submitted by the Plaintiff and the two opt-ins create a superficial impression of similarity, the much more detailed evidence in the depositions shows that the differences among AMs far outweigh any similarities. Viewed as a whole, the record suggests that AM duties varied across and even within locations, that AMs performed both exempt and non-exempt duties, and that the only way to determine the actual mix of job duties of each AM would be to ask each individually. Thus, the record at this stage does not include a "modest factual showing" that all AMs are similarly situated to Rosario with respect to her allegation that non-managerial tasks were the most important tasks she performed as an AM.

### IV.  CONCLUSION

For the reasons set forth above, Rosario's motion for conditional certification is denied without prejudice.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            February 5, 2016